No. 26-1054

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

ROBERT LEVINE,

*Petitioner*,

v.

FEDERAL AVIATION ADMINISTRATION,

*Respondent*.

On Petition for Judicial Review Pursuant to 49 U.S.C. § 46110(a)

## MOTION FOR INTERIM RELIEF

Grayson Clary
  *Counsel of Record*
Adam A. Marshall
Renee Griffin
REPORTERS COMMITTEE FOR
  FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
Telephone: (202) 795-9300
Facsimile: (202) 795-9310

# CERTIFICATE OF COMPLIANCE WITH RULE 18

On March 16, 2026, Petitioner Robert Levine, a Minneapolis-based photojournalist, filed a petition for review in this action challenging the Temporary Flight Restriction ("TFR") noticed by the Federal Aviation Administration ("FAA") in Notice to Airmen No. 6/4375 (the "Notice"). Consistent with Circuit Rule 18 and Federal Rule of Appellate Procedure 18, on March 31, as soon as counsel for the FAA entered an appearance in this action, Petitioner's counsel contacted counsel for Respondent to request that the FAA stay the effectiveness of the TFR pending review.

In particular, Petitioner's counsel informed opposing counsel that the TFR—which, in relevant part, prohibits all drone flights within 3,000 lateral feet and 1,000 vertical feet of "Department of Homeland Security (DHS) facilities and mobile assets, including vessels and ground vehicle convoys," Add. 5—has prevented Petitioner from using his drones to photograph DHS operations or events where DHS vehicles may be present, as they routinely are in Petitioner's neighborhood of Powderhorn Park. Petitioner's counsel informed counsel for Respondent that Petitioner planned to seek relief from this Court no later than April 10 in

light of the ongoing irreparable harm caused by the TFR,[1] and in particular the upcoming Powderhorn Park Mayday Festival on May 3, 2026. Petitioner's counsel explained that the Festival—the largest annual political event in Petitioner's community—draws tens of thousands of attendees, including large numbers of noncitizens and individuals demonstrating against DHS, and that Petitioner has photographed the event with his drone for the last several years, but will be unable to do so this year absent a stay because of the risk that DHS vehicles will be present. Counsel for Respondent responded by email on April 1 to acknowledge receipt of Petitioner's request.

On April 8, counsel for Respondent emailed counsel for Petitioner to state that "[t]he only update I can provide is that FAA is still considering this matter, including whether or not to enforce the current NOTAM." On April 10, counsel for Petitioner spoke by phone with counsel for Respondent, who confirmed that Respondent did not yet have a position to share on Petitioner's request that the agency stay the TFR pending review. This motion follows.

---

[1] The TFR is scheduled to remain effective through and including October 29, 2027. *See* TFR List, Fed. Aviation Admin., https://perma.cc/8AWL-8KQN (last visited Apr. 7, 2026).

# TABLE OF CONTENTS

CERTIFICATE OF COMPLIANCE WITH RULE 18 ............................. i

TABLE OF AUTHORITIES .................................................... iv

CIRCUIT RULE 28(A)(3) GLOSSARY .................................... ix

INTRODUCTION .............................................................. 1

BACKGROUND ................................................................ 3

    I.  Statutory and Regulatory Background. .......................... 3

    II. Factual and Procedural Background. ........................... 6

        A.  Petitioner's Use of Drones in Photojournalism. ........ 6

        B.  The FAA's January 16 Temporary Flight Restriction. ............ 7

        C.  The TFR's Burdens on Petitioner's Photojournalism............... 9

ARGUMENT .................................................................... 12

    I.  Petitioner Is Likely to Succeed on the Merits. ............... 12

        A.  This Court Has Jurisdiction to Review the TFR..................... 12

        B.  The TFR Violates the Administrative Procedure Act. ............. 16

        C.  The TFR Is Void for Vagueness................................. 19

        D.  The TFR Violates the First Amendment As Applied to Petitioner's Use of Drones in Photojournalism. ....................... 21

    II. The Other Stay Factors Likewise Favor Interim Relief................ 23

CONCLUSION.................................................................. 25

CERTIFICATE OF COMPLIANCE ...................................... 27

CERTIFICATE OF SERVICE ............................................. 28

# TABLE OF AUTHORITIES

**Cases**

*Big Mama Rag, Inc. v. United States,*
  631 F.2d 1030 (D.C. Cir. 1980) ........................................................20

*City of Dania Beach v. FAA,*
  485 F.3d 1181 (D.C. Cir. 2007) ...............................................13, 14, 16

*Competitive Enter. Inst. v. U.S. Dep't of Transp.,*
  863 F.3d 911 (D.C. Cir. 2017) .........................................................15

*Corbett v. Transp. Sec. Admin.,*
  19 F.4th 478 (D.C. Cir. 2021) .........................................................14

*Edwards v. District of Columbia,*
  755 F.3d 996 (D.C. Cir. 2014) .....................................................23, 24

*Fed. Commc'ns Comm'n v. Fox Television Stations, Inc.,*
  556 U.S. 502 (2009) ....................................................................18

*Horsehead Res. Dev. Co. v. Browner,*
  16 F.3d 1246 (D.C. Cir. 1994) ........................................................18

*John K. MacIver Inst. for Pub. Pol'y, Inc. v. Evers,*
  994 F.3d 602 (7th Cir. 2021) .........................................................24

*Karem v. Trump,*
  960 F.3d 656 (D.C. Cir. 2020) .....................................................25, 26

*Kolender v. Lawson,*
  461 U.S. 352 (1983) ....................................................................22

*L.A. Press Club v. Noem,*
  No. 2:25-cv-05563, 2026 WL 103972 (C.D. Cal. Jan. 8, 2026) ...........23

*McCullen v. Coakley,*
  573 U.S. 464 (2014) ....................................................................22

*Media Matters for Am. v. Fed. Trade Comm'n,*
  No. 25-5302, 2025 WL 2988966 (D.C. Cir. Oct. 23, 2025)..................25

*Media Matters for Am. v. Paxton,*
138 F.4th 563 (D.C. Cir. 2025) ......................................................16, 25

*Minn. Voters All. v. Mansky,*
585 U.S. 1 (2018) ...............................................................................24

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto.*
*Ins. Co.,*
463 U.S. 29 (1983) .............................................................................18

*Nat'l Press Photographers Ass'n v. McCraw,*
90 F.4th 770 (5th Cir. 2024) .............................................................22

*Nken v. Holder,*
556 U.S. 418 (2009) ............................................................... 13, 25, 26

*Price v. Garland,*
45 F.4th 1059 (D.C. Cir. 2022) ....................................................24, 26

*Safe Extensions, Inc. v. FAA,*
509 F.3d 593 (D.C. Cir. 2007)..................................... 13, 14, 17, 19, 26

*Schenck v. Pro-Choice Network of W. N.Y.,*
519 U.S. 357 (1997) ......................................................................21, 24

*Sherrill v. Knight,*
569 F.2d 124 (D.C. Cir. 1977)............................................................26

*Sinclair Wyo. Refin. Co. LLC v. Env't Prot. Agency,*
114 F.4th 693 (D.C. Cir. 2024) ..........................................................17

*Sorrell v. IMS Health Inc.,*
564 U.S. 552 (2011) ...........................................................................22

*Susan B. Anthony List v. Driehaus,*
573 U.S. 149 (2014) ...........................................................................16

*Taylor v. FAA,*
895 F.3d 56 (D.C. Cir. 2018)...........................................................3, 19

*TikTok Inc. v. Garland,*
  122 F.4th 930 (D.C. Cir. 2024),
  *aff'd,* 604 U.S. 56 (2025) ....................................................23

*Tinius v. Choi,*
  77 F.4th 691 (D.C. Cir. 2023) ......................................22, 23

*U.S. Telecom Ass'n v. Fed. Commc'ns Comm'n,*
  825 F.3d 674 (D.C. Cir. 2016).............................................16

*United States v. Reese,*
  92 U.S. 214 (1875) .............................................................22

*United States v. Williams,*
  553 U.S. 285 (2008) ......................................................20, 21

*Yoder v. Bowen,*
  146 F.4th 516 (6th Cir. 2025) .............................................22

## Statutes

49 U.S.C. § 40103...............................................................4, 19

49 U.S.C. § 46110 ......................................... 2, 12, 13, 14, 17

49 U.S.C. § 46307 ................................................................. 5

5 U.S.C. § 706......................................................................17

Pub. L. No. 112-95, 126 Stat. 11 (2012) ............................. 3

## Regulations

14 C.F.R. § 107..................................................................... 3

14 C.F.R. § 107.47 ............................................................... 4

14 C.F.R. § 91.137 ............................................................... 4

14 C.F.R. § 91.143 ............................................................... 4

14 C.F.R. § 91.25 ................................................................11

14 C.F.R. § 99.7................................................................... 4

Operation and Certification of Small Unmanned Aircraft Systems,
81 Fed. Reg. 42,064 (June 28, 2016) ..................................... 3

Restoring American Airspace Sovereignty,
90 Fed. Reg. 24719 (June 6, 2025) ........................................ 6

**Other Authorities**

Com. Drone All., *New FAA UAS Security NOTAM: FDC 6/4375*,
LinkedIn (Jan. 22, 2026),
https://perma.cc/4TGX-5X2R.................................................. 9

*FAA Steps Up Drone Enforcement in 2025*, Fed. Aviation Admin.
(Feb. 6, 2026), https://perma.cc/JMC4-R46T........................... 5

Fed. Aviation Admin., Aeronautical Information Manual
(Apr. 20, 2023),
https://perma.cc/YLV6-JL5T .................................................. 5

Fed. Aviation Admin., Compliance & Enf't Bull. No. 2026-1
(Jan. 21, 2026),
https://perma.cc/L7YE-XZA9.................................................. 6

Haye Kesteloo, *FAA & Photojournalist Rob Levine: The DHS
Drone Ban Just Got Its First Federal Court Challenge*,
DroneXL (Mar. 17, 2026),
https://perma.cc/A2MC-WEPP .........................................9, 17

Jack Daleo, *FAA Limits Drones Over DHS Assets, Igniting Civil
Liberties Concerns*, Flying (Jan. 30, 2026),
https://perma.cc/2UQV-D95Q.........................................8, 18

John Goglia, *FAA Reverses Course, Grants Drone Journalist
Permission to Fly in No-Fly Zone Over Standing Rock*,
Forbes (Dec. 5, 2016),
https://bit.ly/4c3FE2M........................................................... 7

Jon Harper, *DOD Threatens 'Severe Consequences' for Drone Operators Flying in Restricted Airspace*, DefenseScoop (Mar. 20, 2026), https://perma.cc/U7PF-DKE4......................................................6, 16

Ltr. from News Media Coalition to William McKenna, Chief Counsel, Fed. Aviation Admin. (Jan. 28, 2026), https://perma.cc/33XA-7EBR.......................................................9, 18

Natasha Korecki, *'It Feels Like an Invasion': Minnesotans Stunned as Federal Officers Flood Their State*, NBC News (Jan. 15, 2026), https://perma.cc/RJ3X-4V2Y ........................................................... 2

*Powderhorn Park Neighborhood Data*, Minn. Compass, https://perma.cc/L3T8-GX6N (last visited Mar. 31, 2026)..................11

TFR List, Fed. Aviation Admin., https://perma.cc/8AWL-8KQN (last visited Apr. 7, 2026)............ ii, 1, 8

# CIRCUIT RULE 28(a)(3) GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| ASRP | Aviation Safety Reporting Program |
| CBP | Customs and Border Protection |
| DHS | Department of Homeland Security |
| DOD | Department of Defense |
| DOE | Department of Energy |
| FAA | Federal Aviation Administration |
| ICE | Immigration and Customs Enforcement |
| NOTAM | Notice to Airmen |
| Part 99.7 | 14 C.F.R. § 99.7 |
| Part 107 | 14 C.F.R. § 107 |
| TFR | Temporary Flight Restriction |
| UAS | Unmanned Aircraft Systems |

## INTRODUCTION

On January 16, 2026, the FAA issued a Temporary Flight Restriction of unprecedented scope. In relevant part, the TFR bars unmanned aircraft (drones) from flying within 3,000 lateral feet and 1,000 vertical feet of, *inter alia*, "Department of Homeland Security (DHS) facilities and mobile assets, including vessels and ground vehicle convoys." Add. 5. The prohibition applies across the United States and is effective until October 29, 2027. TFR List, *supra* note 1. But because there is no way to verify in advance whether DHS vehicles—including unmarked cars driven by federal immigration agents—are operating in a given location, drone pilots nationwide cannot know whether a flight will expose them to civil penalties, criminal prosecution, or the destruction of their drone, as the TFR threatens. Indeed, when Petitioner Robert Levine, a Minnesota photojournalist, contacted the FAA's Unmanned Aircraft Systems ("UAS") Support Center for guidance on complying with the restriction, he was candidly told: "The NOTAM is ambiguous. Therefore, any flight carries the risk of inadvertent violation." Add. 23.

It is difficult to imagine a more textbook case of arbitrary action than an order whose scope the agency itself does not know, whose

indeterminacy (by the agency's own account) makes compliance impossible. The result has been a grave chilling effect on the lawful use of drones, including Petitioner's use of drones to exercise his First Amendment right to film and photograph matters of public concern. On May 3, for instance, Petitioner's neighborhood in Minneapolis—Powderhorn Park, a flashpoint for both anti-ICE demonstrations and ICE enforcement because of its substantial noncitizen population[2]—will hold a parade drawing tens of thousands to the area. Petitioner has previously photographed the event using his drone; this year, Petitioner will be grounded because of the risk that DHS vehicles will be present.

This Court should stay the provision of the TFR governing flights near DHS ground vehicles. *See* 49 U.S.C. § 46110(c) (authority to "grant interim relief," in whole or part, from FAA orders). The restriction's indeterminate scope is classically arbitrary and capricious, and its threat of liability for all drone flights at all times in all places exceeds the FAA's statutory authority. For closely related reasons, the TFR is void for vagueness under the Due Process Clause and violates the First

---

[2] *See* Natasha Korecki, *'It Feels Like an Invasion': Minnesotans Stunned as Federal Officers Flood Their State*, NBC News (Jan. 15, 2026), https://perma.cc/RJ3X-4V2Y.

Amendment as applied to the use of drones for photojournalism. Petitioner respectfully urges this Court to stay the TFR in relevant part pending review. In the alternative, should the Court deny a stay, Petitioner requests an expedited briefing schedule on the merits.

## BACKGROUND

### I.     Statutory and Regulatory Background.

"In the FAA Modernization and Reform Act of 2012, Congress tasked the Secretary of Transportation with developing 'a comprehensive plan to safely accelerate the integration of civil unmanned aircraft systems into the national airspace system.'" *Taylor v. FAA*, 895 F.3d 56, 58 (D.C. Cir. 2018) (quoting Pub. L. No. 112-95, § 332(a)(1), 126 Stat. 11, 73 (2012)). To comply, the FAA adopted the regulations set out at 14 C.F.R. § 107 ("Part 107"), "to 'allow for routine civil operation' of small unmanned aircraft systems and 'to provide safety rules for those operations.'" *Id.* at 60 (quoting Operation and Certification of Small Unmanned Aircraft Systems, 81 Fed. Reg. 42,064, 42,066 (June 28, 2016)). In addition to setting safety and licensure requirements specific to drones, Part 107 requires operators to comply with the agency's general regulatory provisions governing temporary flight restrictions

issued by way of a Notice to Airmen ("NOTAM"). *See* 14 C.F.R. § 107.47.

The FAA uses NOTAMs to communicate restrictions issued for a range of purposes, from natural disasters, *see* 14 C.F.R. § 91.137, to avoiding interference with space flight, *see* 14 C.F.R. § 91.143. As relevant here, 14 C.F.R. § 99.7 ("Part 99.7") provides that "[e]ach person operating an aircraft in an [Air Defense Identification Zone] or Defense Area must, in addition to the applicable rules of this part, comply with special security instructions issued by the Administrator in the interest of national security, pursuant to agreement between the FAA and the Department of Defense, or between the FAA and a U.S. Federal security or intelligence agency." Restrictions issued under Part 99.7 exercise the FAA's authority under 49 U.S.C. § 40103(b)(3):

> To establish security provisions that will encourage and allow maximum use of the navigable airspace by civil aircraft consistent with national security, the Administrator, in consultation with the Secretary of Defense, shall—(A) establish areas in the airspace the Administrator decides are necessary in the interest of national defense; and (B) by regulation or order, restrict or prohibit flight of civil aircraft that the Administrator cannot identify, locate, and control with available facilities in those areas.

Violating a Part 99.7 restriction carries serious consequences. The most severe is criminal liability for violating national defense airspace.

*See* 49 U.S.C. § 46307 ("A person that knowingly or willfully violates section 40103(b)(3) of this title or a regulation prescribed or order issued under section 40103(b)(3) shall be fined under title 18, imprisoned for not more than one year, or both," with enhanced penalties for subsequent violations). Operators also face steep civil fines or the revocation of their Part 107 license. *See FAA Steps Up Drone Enforcement in 2025*, Fed. Aviation Admin. (Feb. 6, 2026), https://perma.cc/JMC4-R46T.

In a June 6, 2025 Executive Order, President Trump required the Attorney General and the FAA "to ensure full enforcement of applicable civil and criminal laws when drone operators endanger the public [or] violate established airspace restrictions." Restoring American Airspace Sovereignty, 90 Fed. Reg. 24719, 24720 (June 6, 2025). The FAA, in turn, issued guidance providing that the agency "*will* assess a civil penalty and/or take certificate action" for violations of Part 99.7 restrictions, and that "[c]ompliance and administrative actions will not be used to address such conduct" unless the agency's Chief Counsel approves an exception. Fed. Aviation Admin., Compliance & Enf't Bull. No. 2026-1, at B11 (Jan. 21, 2026), https://perma.cc/L7YE-XZA9 (emphasis added). In a recent public statement, the FAA and other agencies reiterated a "zero-

tolerance policy" approach to enforcing TFRs.  Jon Harper, *DOD Threatens 'Severe Consequences' for Drone Operators Flying in Restricted Airspace*, DefenseScoop (Mar. 20, 2026), https://perma.cc/U7PF-DKE4.

## II.  Factual and Procedural Background.

### A. Petitioner's Use of Drones in Photojournalism.

Petitioner Robert Levine is an experienced photojournalist based in Minneapolis, Minnesota.  Add. 6.  Since 2016, Petitioner has held a Part 107 license to pilot drones for commercial purposes, including editorial and commercial photography.  Add. 7.  That year, for instance, Petitioner was the first drone journalist granted an exemption from a law-enforcement TFR to document the Standing Rock protests in North Dakota.  Add. 10–11; *see also* John Goglia, *FAA Reverses Course, Grants Drone Journalist Permission to Fly in No-Fly Zone Over Standing Rock*, Forbes (Dec. 5, 2016), https://bit.ly/4c3FE2M.

Petitioner uses drones to photograph a range of subjects today, from wetlands threatened by mining to recent protests against DHS operations.  Add. 9.  Petitioner sells those photos to the *Minnesota Reformer*, a local newsroom, among other purchasers.  Add. 9–10. Petitioner's drone photography accounts for roughly ten percent of his

income, Add. 17, and his current fleet of drones cost him roughly $10,000 over the last year, Add. 8. Before this TFR issued, Petitioner typically flew his drone to take photos or film four times a month. Add. 10.

**B. The FAA's January 16 Temporary Flight Restriction.**

On January 16, 2026, the FAA issued NOTAM No. 6/4375 (the "Notice"). The Notice provides:

> Pursuant to 14 CFR Section 99.7, special security instructions (SSI), all unmanned [aircraft] are prohibited from flying within a stand-off distance of 3,000FT[] laterally and 1000FT above unless indicated by the FAA by NOTAM or other means. TO: Department of Defense (DOD), Department of Energy (DOE), and Department of Homeland Security (DHS) facilities and mobile assets, including vessels and ground vehicle convoys and their associated escorts, such as United States Coast Guard (USCG) operated vessels. Pursuant to 49 U.S.C. Section 40103(B)(3), the FAA classifies the airspace defined in this NOTAM and in further detail by the FAA website identified below as 'national defense airspace.'

Add. 5. The Notice goes on to warn that the TFR may be enforced by "criminal charges," by "imposing civil penalties and revoking FAA certificates," or—if the drone is "deemed to pose a credible safety or security threat"—by seizing or destroying it. *Id.* The flight restriction is scheduled to last until October 29, 2027. *See* TFR List, *supra* note 1.

The Notice replaced NOTAM FDC 5/6378, *see* Add. 5, which covered only facilities and assets of the Departments of Defense and Energy, not

7

the Department of Homeland Security. In other words, the Notice expanded a framework that "was previously limited to naval vessels operating in U.S. coastal waters and Department of Energy assets moving nuclear materials" to an agency that routinely operates unmarked ground vehicle convoys in urban areas. Jack Daleo, *FAA Limits Drones Over DHS Assets, Igniting Civil Liberties Concerns*, Flying (Jan. 30, 2026), https://perma.cc/2UQV-D95Q (quoting Brandon Youngblood, former head of the FAA Air Traffic Organization's UAS Security and C-UAS Integration Office). To further define the covered area, the Notice refers to https://udds-faa.opendata.arcgis.com, and indicates that "points of contact for specific covered facilities and mobile assets may be available" there. Add. 5. But as of this filing, the linked dataset does not identify the locations of any DHS ground vehicles.

The Notice also provides that operators "may contact the FAA System Operations Support Center (SOSC) . . . for further assistance." *Id.* But "[a]s of early March, what comes back" upon contacting SOSC according to public reporting "is boilerplate that refers you to the same tools that don't show the restriction." Haye Kesteloo, *FAA & Photojournalist Rob Levine: The DHS Drone Ban Just Got Its First*

*Federal Court Challenge*, DroneXL (Mar. 17, 2026), https://perma.cc/A2MC-WEPP. A number of groups and individuals—from news organizations[3] to the Commercial Drone Alliance[4]—have contacted the FAA in an effort to understand how to comply with the Notice. The FAA still has offered no means of verifying the TFR's scope.

### C. The TFR's Burdens on Petitioner's Photojournalism.

On January 21, 2026, Petitioner contacted the FAA's UAS Support Center for guidance on the TFR. Add. 15. Petitioner explained that in light of extensive DHS operations in the Twin Cities, he was "grounded" because he could not be sure whether any flight would violate the TFR. Add. 25. As a result, Petitioner was "missing out on income and opportunities to do photojournalism." *Id.* In response, Petitioner was told: "What we have is an ambiguous TFR. We are working to resolve this." Add. 24. When Petitioner expressed incredulity, he was again told: "That's the crux of the matter. The NOTAM is ambiguous. Therefore,

---

[3] *See* Ltr. from News Media Coalition to William McKenna, Chief Counsel, Fed. Aviation Admin. (Jan. 28, 2026), https://perma.cc/33XA-7EBR.

[4] *See* Com. Drone All., *New FAA UAS Security NOTAM: FDC 6/4375*, LinkedIn (Jan. 22, 2026), https://perma.cc/4TGX-5X2R.

any flight carries the risk of inadvertent violation." Add. 23. Petitioner was advised to land if he believed he was violating the TFR and to self-report any suspected violations using the FAA's Aviation Safety Reporting Program (ASRP), which he was told "can provide immunity from enforcement action." Add. 24. The ASRP does not, in fact, provide immunity from enforcement if the information disclosed concerns "criminal offenses," including violations of the TFR. 14 C.F.R. § 91.25.

Without other options to avoid enforcement, Petitioner has reduced his use of drones for photography. Add. 17–18. Petitioner's neighborhood has a significant noncitizen population, *see Powderhorn Park Neighborhood Data*, Minn. Compass, https://perma.cc/L3T8-GX6N (last visited Mar. 31, 2026) (noting that more than 13% of residents are foreign-born), and has been a focal point of DHS operations this year; when Renee Good was killed by ICE agents, Petitioner was just six blocks away. Add. 12. Petitioner has also seen ICE and CBP agents operating from a mix of marked and unmarked vehicles, Add. 12–13, and saw reports of DHS vehicles operating within a few miles of his home as recently as Monday, Add. 11–12. Petitioner would like to document those operations with his drones but cannot under the TFR. Add. 17. Even

when aiming to document other events, Petitioner cannot reliably identify unmarked DHS vehicles while flying, *see* Add. 18; cannot reliably draw a line of sight to all vehicles within 3,000 feet because buildings and natural features would block his view, Add. 13–14; and cannot reliably judge whether his drone is within 3,000 feet of a distant object, *see id.*

The result is that reducing his use of drones (and forgoing the opportunity to take photographs and video of newsworthy events) is the only reliable way for Petitioner to avoid consequences under the TFR. For instance, Petitioner would otherwise plan to fly his drone to photograph the annual Mayday Festival parade in Powderhorn Park, one of his community's largest political events, as he has for the last several years. Petitioner anticipates that the participants—upwards of 30,000 in a typical year—will include noncitizen residents, as well as protest activity directed toward DHS. Add. 19. Based on the routine presence of marked and unmarked DHS vehicles in his neighborhood, Petitioner expects DHS vehicles are likely to be present that day. Add. 12–13, 19. Petitioner therefore intends to forgo documenting the parade to avoid violating the TFR. Add. 19. But if the TFR were lifted, Petitioner would resume flying drones to take photos, including at the parade. Add. 20.

11

## ARGUMENT

This Court has power to review "order[s]" of the FAA, 49 U.S.C. § 46110(a), along with authority to "grant interim relief by staying the order or taking other appropriate action," *id.* § 46110(c). Interim relief from the provision of the TFR governing DHS ground vehicles is appropriate and urgent here. *See generally Nken v. Holder*, 556 U.S. 418, 431 (2009) (considerations governing a stay). Petitioner is likely to succeed in showing that the TFR's unknowable sweep violates both the Administrative Procedure Act and the Constitution, and he faces irreparable First Amendment harm each day it remains in effect— especially so if it prevents him from photographing one of the largest political events in his community on May 3. This Court should grant a stay in relevant part pending disposition of the Petition for Review.

## I.    Petitioner Is Likely to Succeed on the Merits.

### A.    This Court Has Jurisdiction to Review the TFR.

This Court has jurisdiction to hear this action under 49 U.S.C. § 46110, which empowers this Court to review FAA "order[s]"—language this Court has interpreted to encompass any FAA action that "mark[s] the consummation of the agency's decisionmaking process and

determine[s] rights or obligations or give[s] rise to legal consequences," *Safe Extensions, Inc. v. FAA*, 509 F.3d 593, 598 (D.C. Cir. 2007); *see also City of Dania Beach v. FAA*, 485 F.3d 1181, 1187 (D.C. Cir. 2007) ("'order' in this provision should be read expansively" (citation and internal quotation marks omitted)). The TFR plainly meets that requirement.

On its face, the TFR threatens anyone who violates it with "criminal charges," "civil penalties," "revo[cation of] FAA certificates," or even "seizure" or "destruction" of their drone. Add. 5. Those severe consequences are more than enough to demonstrate that the TFR is a reviewable order. *See Safe Extensions*, 509 F.3d at 598 (FAA advisory that "effectively prohibit[ed] airports from buying" certain products and barred petitioner from selling them to airports was "final" and therefore an "order"). Further, "[n]othing in the [TFR] indicates that the FAA's statements and conclusions are tentative, open to further consideration, or conditional on future agency action"; the Notice altered Petitioner's obligations as soon as it issued. *City of Dania Beach*, 485 F.3d at 1188.

Petitioner also has standing to bring this suit (and, concomitantly, has "disclos[ed] a substantial interest" in the TFR, 49 U.S.C. § 46110(a)). As a drone operator, Petitioner is "directly regulated" by the TFR and

13

"faces the threat of enforcement and ensuing penalties should he fail to comply" with it, which suffices to show standing. *Corbett v. Transp. Sec. Admin.*, 19 F.4th 478, 483 (D.C. Cir. 2021). Petitioner is a photojournalist who regularly operates drones to photograph newsworthy events in Minneapolis; he wishes to continue that practice, including by documenting DHS operations and events where DHS may be present. Add. 15. But on multiple occasions since the issuance of the TFR, Petitioner has chosen not to fly his drone because doing so would risk incurring penalties. Add. 17–19; *see Competitive Enter. Inst. v. U.S. Dep't of Transp.*, 863 F.3d 911, 914 (D.C. Cir. 2017) (petitioner showed standing to challenge e-cigarette regulation where "he had used e-cigarettes on flights" but "no longer does so given the penalties for violating the regulation"). Petitioner's concern is not conjecture—DHS vehicles routinely operate in his own neighborhood, including within a few miles of his home as recently as this week, as well as elsewhere in Minneapolis where he has flown drones. Add. 11–13, 15, 17–19. And even where Petitioner intends to document something other than DHS operations, each flight is a gamble because he cannot know in advance whether marked or unmarked DHS vehicles are nearby. Add. 19.

No further action on the FAA's part (or Petitioner's) is necessary for that injury to ripen. "Pre-enforcement review, particularly in the First Amendment context, does not require plaintiffs to allege that they 'will in fact' violate the regulation in order to demonstrate an injury." *U.S. Telecom Ass'n v. Fed. Commc'ns Comm'n*, 825 F.3d 674, 739 (D.C. Cir. 2016) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 163 (2014)). Petitioner need only provide a "credible statement" of his "intent to commit violative acts and a conventional background expectation that the government will enforce the law." *Id.* (citation omitted). And here, that expectation is sharpened by the agency's no-holds-barred statements that it will take a "zero-tolerance" approach. Harper, *supra*.

That clear threat of liability has already cost Petitioner reporting opportunities, *see Media Matters for Am. v. Paxton*, 138 F.4th 563, 585 (D.C. Cir. 2025) ("current self-censorship in [journalist's] reporting" is cognizable injury), as well as the use of drones in which Petitioner invested thousands for a business that generates ten percent of his income, Add. 17–18. Those harms represent a "concrete and particularized injury that is actual or imminent, caused by or fairly

traceable to the [TFR], and redressable by the court." *City of Dania Beach*, 485 F.3d at 1185 (citation and internal quotation marks omitted).

**B. The TFR Violates the Administrative Procedure Act.**

Orders reviewed under 49 U.S.C. § 46110 are invalid where the agency's actions "were 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Safe Extensions*, 509 F.3d at 604 (quoting 5 U.S.C. § 706(2)(A)). Here, the TFR lacks basic markers of "reasoned decision making," *Sinclair Wyo. Refin. Co. LLC v. Env't Prot. Agency*, 114 F.4th 693, 711 (D.C. Cir. 2024), and exceeds FAA authority.

The TFR's most obvious shortcoming is the one the FAA freely admitted to Petitioner: Compliance is impossible because the TFR's scope is unknowable. Add. 23 (email from FAA's UAS Support Center advising Petitioner that "[t]he NOTAM is ambiguous" and therefore "any flight carries the risk of inadvertent violation"); *Sinclair*, 114 F.4th at 712 (requiring regulated parties to achieve what agency had previously found was "virtually impossible" is arbitrary (citation omitted)). None of the sources the FAA advises pilots to consult to verify active TFRs displays the scope of this one. Add. 14; *see also* Kesteloo, *supra*. Nor can drone operators visually identify the assets that trigger a bubble of liability

because DHS routinely operates unmarked cars.  Add. 13–14.

In that respect, the FAA plainly "failed to consider an important aspect of the problem."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Adding DHS to the list of agencies whose vehicles summon a roving TFR wildly expands the restriction's scope and carries unique compliance difficulties.  Unlike the mammoth naval vessels of the Department of Defense, unmarked cars cannot be identified with the naked eye or a drone's camera.  And unlike rarefied Department of Energy convoys transporting nuclear weapons, DHS vehicles operate in crowded urban environments across the country.  The result is a TFR whose scope is unique in FAA history.  *See* Daleo, *supra*; *see also* Ltr. from News Media Coalition, *supra* note 4.  But the FAA has shown no awareness that the TFR imposes novel burdens on regulated parties or departs so dramatically from the agency's past practice, let alone explained its reasons for taking this exceptional step.  *See Fed. Commc'ns Comm'n v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) (unexplained and unacknowledged change is arbitrary).

Just as fundamentally, any problem the TFR intends to address rests on "pure speculation."  *Horsehead Res. Dev. Co. v. Browner*, 16 F.3d

17

1246, 1269 (D.C. Cir. 1994). Petitioner is aware of no reported incidents in which a drone interfered with the operations of DHS ground vehicles, and the FAA appears to have made no effort to compare the benefits of addressing a hypothetical problem to the staggering burdens this TFR imposes. *See Safe Extensions*, 509 F.3d at 606 (FAA acted arbitrarily where it "offered no evidence whatsoever of problems in the field" before acting). Nor has the agency explained why the 'temporary' restriction is set to last the better part of two years when a typical TFR lasts days.

In much the same vein, the TFR is contrary to law because it exceeds the FAA's authority. Decisions to impose Part 99.7 restrictions exercise the FAA's authority "[t]o establish security provisions that will encourage and allow maximum use of the navigable airspace by civil aircraft consistent with national security." 49 U.S.C. § 40103(b)(3). A restriction so broad and undefined that "*any* flight carries the risk of inadvertent violation" does not maximize use of the navigable airspace by civil aircraft. Add. 23 (emphasis added). Nor can a restriction that shadows all drone flights in all places at all times with the threat of grave penalties be reconciled with "Congress' directive to integrate such aircraft into the national airspace system." *Taylor*, 895 F.3d at 67.

In sum, the FAA has conjured roaming, invisible bubbles of civil and criminal liability nationwide—without explanation, without evidence, and without regard for the consequences. Because it disregards the most basic demands of administrative law, the TFR violates the APA.

### C. The TFR Is Void for Vagueness.

The same indeterminacy violates the Due Process Clause. A restriction is unconstitutionally vague for purposes of due process if it either "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). And while all regulations must clear at least those bars, "[t]hese standards are especially stringent, and an even greater degree of specificity is required, where, as here, the exercise of First Amendment rights may be chilled." *Big Mama Rag, Inc. v. United States*, 631 F.2d 1030, 1035 (D.C. Cir. 1980).

Under either ordinary or heightened review for vagueness, there should be little question that the TFR fails to provide fair notice. Here, a person *employed by the FAA to provide guidance to drone operators* told Petitioner that "[t]he NOTAM is ambiguous. Therefore, any flight carries

19

the risk of inadvertent violation." Add. 23. The TFR, after all, is triggered by a fact Petitioner has no means of verifying before or after take-off. Add. 13–14. And that difficulty is compounded by the fact that "the buffer zone floats," *Schenck v. Pro-Choice Network of W. N.Y.*, 519 U.S. 357, 377 (1997), with each DHS vehicle carrying its own independent bubble. The Supreme Court has held that even a vastly smaller floating buffer zone of 15 feet that surrounded multiple moving individuals would make it unworkably difficult "to know how to remain in compliance." *Id.* at 378 & n.10. Here the impossibility is even starker.

That same dynamic leaves the TFR "so standardless that it authorizes or encourages seriously discriminatory enforcement." *Williams*, 553 U.S. at 304. As the FAA told Petitioner, every flight *might* be illegal, Add. 23, leaving it to agency officials and prosecutors to pick and choose unlucky pilots to defend themselves in court. Due process does not permit the government to "set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained." *Kolender v. Lawson*, 461 U.S. 352, 358 n.7 (1983) (quoting *United States v. Reese*, 92 U.S. 214, 221 (1875)). Yet the TFR sets drone operators exactly that trap.

**D.  The TFR Violates the First Amendment As Applied to Petitioner's Use of Drones in Photojournalism.**

Finally, the TFR violates the First Amendment as applied to Petitioner's use of drones in photojournalism.  Because "the creation and dissemination of information are speech within the meaning of the First Amendment," *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011), there is a "First Amendment interest in using a drone to take images," *Yoder v. Bowen*, 146 F.4th 516, 523 (6th Cir. 2025) (citing *Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 783, 789–90 (5th Cir. 2024)).  The Supreme Court has made clear, too, that buffer zones that necessarily frustrate the exercise of First Amendment rights—even where they "say[] nothing about speech on [their] face"—are "subject to First Amendment scrutiny."  *McCullen v. Coakley*, 573 U.S. 464, 476 (2014); *cf. Tinius v. Choi*, 77 F.4th 691, 699–700 (D.C. Cir. 2023) (applying First Amendment scrutiny to curfew that primarily regulated conduct "without regard to its expressive character or message").  Here, the TFR in practice outlaws all drone photography of DHS operations and shadows all drone photography, period, with the prospect of liability.

Whether the TFR is viewed as a time, place, or manner restriction, *see Tinius*, 77 F.4th at 700; a "regulation of conduct that has an

expressive element," *TikTok Inc. v. Garland*, 122 F.4th 930, 949 (D.C. Cir. 2024), *aff'd*, 604 U.S. 56 (2025) (citation omitted); or a regulation that "is directed at an activity without an expressive component but imposes a disproportionate burden upon those engaged in protected First Amendment activities," *id.* (citation and internal quotation marks omitted), the analysis of the TFR's burdens ultimately differs little. Even ignoring the obvious likelihood that the restriction was adopted for the content- and viewpoint-based purpose of shielding DHS operations from public scrutiny,[5] the TFR cannot survive any degree of scrutiny.

Even intermediate scrutiny, for instance, would require the FAA to demonstrate that the TFR is "narrowly tailored to further a substantial government interest." *Edwards v. District of Columbia*, 755 F.3d 996, 1002 (D.C. Cir. 2014). And the FAA must show, too "that the harms it recites are real," not "mere speculation." *Id.* at 1003 (citation omitted). But as already canvassed above, there is simply no evidence that the sweeping restrictions in the TFR respond to any particular problem. And

---

[5]    *See L.A. Press Club v. Noem*, No. 2:25-cv-05563, 2026 WL 103972, at *9 (C.D. Cal. Jan. 8, 2026) (journalists plausibly alleged a DHS policy "of treating videorecording of DHS agents in public as a threat" (citation omitted)).

here again, the floating nature of the TFR's countless buffer zones creates a profound "lack of certainty" that inevitably "leads to a substantial risk that much more speech will be burdened." *Schenck*, 519 U.S. at 378.

The same considerations make clear that the TFR would fail even review for mere reasonableness. *See Price v. Garland*, 45 F.4th 1059, 1071–72 (D.C. Cir. 2022) (applying a reasonableness standard to restrictions on filming a documentary on National Park Service land).[6] Indeed, even that standard condemns "indeterminate prohibition[s]" that lack "objective, workable standards." *Minn. Voters All. v. Mansky*, 585 U.S. 1, 21 (2018). That is, of course, what the FAA has adopted—an indeterminate TFR made up of a flotilla of invisible, moving bubbles. Under any standard, the TFR's chilling sweep violates the First Amendment as applied to Petitioner's use of drones in photojournalism.

## II. The Other Stay Factors Likewise Favor Interim Relief.

"The likelihood of success carries great weight in any stay analysis," *Media Matters for Am. v. Fed. Trade Comm'n*, No. 25-5302, 2025 WL

---

[6] *Price* distinguished the documentary film the plaintiff in that case intended to ultimately edit from the act of "gathering information for *news* dissemination." 45 F.4th at 1071 n.** (quoting *John K. MacIver Inst. for Pub. Pol'y, Inc. v. Evers*, 994 F.3d 602, 612 (7th Cir. 2021)). By its terms, then, *Price* does not apply to Petitioner's journalism.

2988966, at *3 (D.C. Cir. Oct. 23, 2025), all the more so where First Amendment interests are at stake, *id.* But regardless, all the stay factors point in the same direction here. *See Nken*, 556 U.S. at 434 (stay inquiry weighs likelihood of success, irreparable harm to movant, any risk of injury to the other party, and where the public interest lies).

For one, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *Paxton*, 138 F.4th at 585 (citation omitted), as does "a prospective violation of a constitutional right" under the Due Process Clause, *Karem v. Trump*, 960 F.3d 656, 667 (D.C. Cir. 2020) (citation omitted). Here, thanks to the TFR's vague and chilling sweep, Petitioner has already lost out on the opportunity to photograph events that he cannot travel back in time to document. Add. 17–19. He stands to miss out again (and again) each day the TFR remains in force, absent a stay from this Court.

The balance of the equities and the public interest—which "merge when the Government is the opposing party," *Nken*, 556 U.S. at 435—likewise favor interim relief. The FAA will not suffer harm from a stay of the provision of the TFR governing DHS vehicles, a restriction for which the FAA has "offered no evidence whatsoever of problems in the

24

field." *Safe Extensions*, 509 F.3d at 606. The government has no legitimate interest, for that matter, in enforcing policies that so plainly violate the Due Process Clause or the First Amendment. *See Karem*, 960 F.3d at 668. But it should go without saying that the public interest is best served by safeguarding the free practice of journalism, because "[n]ot only newsmen and the publications for which they write, but also the public at large have an interest protected by the first amendment in assuring that restrictions on newsgathering be no more arduous than necessary." *Sherrill v. Knight*, 569 F.2d 124, 129–30 (D.C. Cir. 1977).

The TFR disserves that "cardinal First Amendment interest in protecting and promoting the free discussion of governmental affairs." *Price*, 45 F.4th at 1071 (citations and internal quotation marks omitted). To redress that ongoing harm, this Court should stay the provision of the TFR governing DHS ground vehicles pending disposition of the Petition.

## CONCLUSION

For the foregoing reasons, Petitioner respectfully urges this Court to stay the provision of the TFR governing DHS ground vehicles.

Date: April 10, 2026                Respectfully submitted,

/s/ *Grayson Clary*
Grayson Clary

25

*Counsel of Record*
Adam A. Marshall
Renee Griffin
REPORTERS COMMITTEE FOR
  FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
Telephone: (202) 795-9300
Facsimile: (202) 795-9310

# CERTIFICATE OF COMPLIANCE

I hereby certify that this Motion for Interim Relief complies with Circuit Rule 27(a)(2) and Federal Rule of Appellate Procedure 27(d)(1)–(2) because it contains 5,183 words, excluding the parts of the motion exempted by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(e)(1), and it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Date: April 10, 2026

/s/ *Grayson Clary*
Grayson Clary
*Counsel of Record*
 *for Petitioner*

# CERTIFICATE OF SERVICE

I hereby certify that on April 10, 2026, I electronically filed the foregoing Motion for Interim Relief with the U.S. Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system. I further certify that I caused four paper copies of this motion to be delivered to the Clerk within two business days of electronic filing, pursuant to Circuit Rules 27(b) and 25(d).

Date: April 10, 2026

/s/ *Grayson Clary*
Grayson Clary
*Counsel of Record*
 *for Petitioner*