**ORAL ARGUMENT NOT YET SCHEDULED**

**No. 26-1054**

# In the United States Court of Appeals for the District of Columbia Circuit

ROBERT LEVINE,

*Petitioner*,

*v.*

FEDERAL AVIATION ADMINISTRATION,

*Respondent.*

On Petition for Judicial Review Pursuant to 49 U.S.C. § 46110(a)

**BRIEF OF AMERICAN CIVIL LIBERTIES UNION FOUNDATION, AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF THE DISTRICT OF COLUMBIA, ELECTRONIC FRONTIER FOUNDATION, NATIONAL PRESS PHOTOGRAPHERS ASSOCIATION, AND PROFESSIONAL PHOTOGRAPHERS OF AMERICA AS *AMICI CURIAE* IN SUPPORT OF PETITIONER AND VACATUR**


David A. Schulz
Stacy Livingston
MEDIA FREEDOM AND INFORMATION ACCESS CLINIC
YALE LAW SCHOOL
127 Wall Street
New Haven, CT 06511
Tel: (212) 850-6103
David.Schulz@ylsclinics.org
*Counsel for Amici*

Arthur B. Spitzer
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF THE DISTRICT OF COLUMBIA
529 14th Street, NW, Suite 420
Washington, DC 20045
202-457-0800
aspitzer@acludc.org
*Counsel for Amicus American Civil Liberties Union Foundation of the District of Columbia*

Scarlet Kim
Brian Hauss
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
NY, NY 10004
212-549-2500
scarletk@aclu.org
bhauss@aclu.org

*Counsel for Amicus American Civil Liberties Union Foundation*

Mickey H. Osterreicher
Alicia Wagner Calzada
NATIONAL PRESS PHOTOGRAPHERS ASSOCIATION
120 Hooper St.
Athens, GA 30602
(716) 983-7800
lawyer@nppa.org
advocacy@nppa.org

*Counsel for Amicus National Press Photographers Association*

## CERTIFICATE AS TO PARTIES, RULINGS, RELATED CASES, AND CORPORATE DISCLOSURE STATEMENT

### Parties and Amici

Except for the following, all parties, intervenors, and *amici* appearing in this Court are listed in the Brief for Petitioner.

1. American Civil Liberties Foundation
2. American Civil Liberties Foundation of the District of Columbia
3. Electronic Frontier Foundation
4. National Press Photographers Association
5. Professional Photographers of America

### Rulings Under Review

References to the rulings at issue appear in the Brief for Petitioner.

### Related Cases

This case has not previously been before this Court or any other court. Counsel is unaware of any other related cases currently pending in this Court or in any other court.

## Rule 28(a)(1) Certification

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 28(a)(1), *amici curiae* American Civil Liberties Union Foundation, American Civil Liberties Union Foundation of the District of Columbia, Electronic Frontier Foundation, National Press Photographers Association, and Professional Photographers of America state that they do not have a parent corporation and that no publicly held corporation owns 10% or more of their stock.

## Rule 29(a)(4)(E) Certification

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amici* certify that no party or counsel for a party authored the brief in part or in whole. Aside from *amici* or their counsel, no person or entity made a financial contribution to fund the preparation or submission of the brief.

Dated: September 4, 2026

/s/ David A. Schulz
David A. Schulz

**TABLE OF CONTENTS**

CERTIFICATE AS TO PARTIES, RULINGS, RELATED CASES, AND CORPORATE DISCLOSURE STATEMENT ........................ i

TABLE OF CONTENTS ........................................................................ iii

TABLE OF AUTHORITIES ...................................................................... iv

GLOSSARY ........................................................................................ xiii

STATEMENT OF IDENTITY, INTEREST, AND AUTHORITY TO FILE ........................................................................................................ 1

BACKGROUND .................................................................................... 2

SUMMARY OF ARGUMENT .................................................................. 4

ARGUMENT ........................................................................................ 7

I. The First Amendment Protects Drone Recording as an Invaluable Newsgathering Tool ............................................ 7

II. The NOTAM Violated the First Amendment by Unduly Abridging the Right to Record ............................................ 12

A. There is good reason to believe that the NOTAM's purpose was to prevent drones from reporting on immigration enforcement, triggering strict scrutiny. . 14

B. Even if the FAA had a purpose other than to restrict drone newsgathering, the NOTAM triggered and failed the *O'Brien* test. ......................... 21

CONCLUSION .................................................................................... 30

CERTIFICATE OF COMPLIANCE ....................................................... 32

CERTIFICATE OF SERVICE ............................................................... 33

## TABLE OF AUTHORITIES

### Cases

*360 Virtual Drone Servs. LLC v. Ritter*,
102 F.4th 263 (4th Cir. 2024) .......... 8

*ACLU of Ill. v. Alvarez*,
679 F.3d 583 (7th Cir. 2012) .......... 7, 8

*Arcara v. Cloud Books, Inc.*,
478 U.S. 697 (1986) .......... 22

*Askins v. United States Dep't of Homeland Sec.*,
899 F.3d 1035 (9th Cir. 2018) .......... 20

*Brown v. Ent. Merchs. Ass'n*,
564 U.S. 786 (2011) .......... 8

*Chicago Headline Club v. Noem*,
168 F.4th 1033 (7th Cir. 2026) .......... 18

*Chicago Headline Club v. Noem*,
810 F. Supp. 3d 842 (N.D. Ill. 2025) .......... 18

*Citizens United v. FEC*,
558 U.S. 310 (2010) .......... 7

*City of Ladue v. Gilleo*,
512 U.S. 43 (1994) .......... 29

*Cohen v. Cowles Media Co.*,
501 U.S. 663 (1991) .......... 21

*Decker v. Nw. Env't. Def. Ctr.*,
568 U.S. 597 (2013) .......... 2

*Grosjean v. Am. Press Co.*,
297 U.S. 233 (1936) .......... 21

*Hutchins v. District of Columbia*,
188 F.3d 531 (D.C. Cir. 1999) ........................................ 22, 23

*Initiative & Referendum Inst. v. U.S. Postal Serv.*,
417 F.3d 1299 (D.C. Cir. 2005) ........................................ 26, 29

*L.A. Press Club v. City of Los Angeles*,
799 F. Supp. 3d 1007 (C.D. Cal. 2025) ........................................ 15

*L.A. Press Club v. Noem*,
799 F. Supp. 3d 1036 (C.D. Cal. 2025) ........................................ 17

*L.A. Press Club v. Noem*,
171 F.4th 1179 (9th Cir. 2026) ........................................ 16, 17

*Massimino v. Benoit*,
No. 25-1104, 2026 WL 2386308 (2d Cir. Aug. 17, 2026) ........................................ 7

*McCullen v. Coakley*,
573 U.S. 464 (2014) ........................................ 28

*Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*,
460 U.S. 575 (1983) ........................................ 6, 20, 21

*Nat'l Press Photographers Ass'n v. McCraw*,
90 F.4th 770 (5th Cir. 2024) ........................................ 23

*People for the Ethical Treatment of Animals, Inc. v. N.C. Farm Bureau Fed'n, Inc.*,
60 F.4th 815 (4th Cir. 2023) ........................................ 21

*Price v. Garland,*
45 F.4th 1059 (D.C. Cir. 2022) ........................................ 7, 27

*R.A.V. v. City of St. Paul, Minn.*,
505 U.S. 377 (1992) ........................................ 20

*Reynolds v. Middleton*,
779 F.3d 222 (4th Cir. 2015) .......... 28

*Sandvig v. Sessions*,
315 F. Supp. 3d 1 (D.D.C. 2018) .......... 9

*Schenck v. Pro-Choice Network of Western New York*,
519 U.S. 357 (1997) .......... 6, 29

*Sherrill v. Knight*,
569 F.2d 124 (D.C. Cir. 1977) .......... 8

*TikTok v. Garland*,
604 U.S. 56 (2025) .......... 22, 23

*Tincher v. Noem*,
816 F. Supp. 3d 931 (D. Minn. Jan. 13, 2026) .......... 19

*Tinius v. Choi*,
77 F.4th 691 (D.C. Cir. 2023) .......... 22, 23, 24

*Tinius v. Choi*,
No. 21-cv-0907, 2022 WL 899238 (D.D.C. Mar. 28, 2022) .......... 22, 23

*United States v. O'Brien*,
391 U.S. 367 (1968) .......... 6, 21, 22, 23, 24, 26

*United States v. Stevens*,
559 U.S. 460 (2010) .......... 8

*Yoder v. Brown*,
146 F.4th 516 (6th Cir. 2025) .......... 8

**Statutes**

54 U.S.C. § 100905 .......... 27

FAA Extension, Safety, and Security Act of 2016, Pub. L. No. 114-190,
130 Stat. 615, 630 (2016) .......... 28

**Other Authorities**

*2 Killed as KOMO News Helicopter Crashes Near Space Needle*, KOMO News (March 18, 2014), https://komonews.com/news/local/2-killed-as-komo-news-helicopter-crashes-near-space-needle-11-20-2015 .......... 12

CBS News, *California Farm Worker Injured in Immigration Raid Dies; More than 300 Arrested, Feds Say* (July 12, 2025), https://www.cbsnews.com/news/more-than-300-arrested-immigration-raids-southern-california-farms-feds/ ........................... 16

Charles Thrush, Leigh Giangreco & Alex V. Hernandez, *Agents Tear Gas, Detain Demonstrators Outside Broadview ICE Facility During Protest*, Block Club Chicago (Sep. 20, 2025), https://blockclubchicago.org/2025/09/19/ice-tear-gasses-detains-protesters-outside-broadview-facility/ ............................................... 17

Daniel Hentz, *8 Ways Journalists Visualized California's Out-of-Control Wildfires*, Glob. Investigative Journalism Network (Sep. 26, 2018), https://gijn.org/stories/california-wildfires/ ....................................... 12

David Struett, *FAA Sets Unprecedented Drone Restrictions Over Chicago as Feds Step Up Immigration Arrests*, Chicago Sun Times (Oct. 2, 2025), https://chicago.suntimes.com/news/2025/10/02/faa-drone-zone-homeland-security ......................................................... 18

Delanie Smither, *How the New York Times Used Drones and Maps to Visualize Hurricane Harvey's Impact on Texas*, Storybench (Sep. 29, 2017), https://www.storybench.org/how-the-new-york-times-used-drones-and-maps-to-visualize-hurricane-harveys-impact-on-texas/ . 11

Dept. of Homeland Security, *ICE Launches Operation Midway Blitz in Honor of Katie Abraham to Target Criminal Illegal Aliens Terrorizing Americans in Sanctuary Illinois* (Sep. 8, 2025), https://www.dhs.gov/news/2025/09/08/ice-launches-operation-midway-blitz-honor-katie-abraham-target-criminal-illegal ............. 17

Digital Innovators' Summit, *Drone Journalism: 5 Great Examples*, Medium (Aug. 22, 2016), https://medium.com/@DISummit/drone-journalism-5-great-examples-1b482dd6bd78 ....................................9

Evan Simon, *'A Different Set of Rules': Thermal Drone Footage Shows Musk's AI Power Plant Flouts Clean Air Rules*, Tennessee Lookout (Feb. 16, 2026), https://tennesseelookout.com/2026/02/16/a-different-set-of-rules-thermal-drone-footage-shows-musks-ai-power-plant-flouts-clean-air-rules/ ....................................11

Forbes Breaking News, *Drone Footage: Anti-ICE Protestors Face Off Against Authorities in Los Angeles, California* (YouTube, Jun. 9, 2025), https://www.youtube.com/watch?v=BgAgJyWC89k ...............10

Forbes Breaking News, *Kristi Noem Claims Videotaping ICE Agents is 'Violence' Following Camarillo, California Farm Raids*, at 0:22 (YouTube, July 14, 2025), https://www.youtube.com/watch?v=uDFX4q6huH8 ..........................16

Gigi Douban, *Trump Border Czar Tom Homan Announces Minnesota Immigration Surge is Ending*, NPR (Feb. 12, 2026), https://www.npr.org/2026/02/12/nx-s1-5712280/minnesota-ice-surge-ends ....................................18

Ingraham Angle, *Homan Pushes to Create 'Database' to Make Those Who Impede ICE 'Famous'*, Fox News (Jan. 15, 2026), https://www.foxnews.com/video/6387789141112 ...............................20

Jack Gillum & Joan Lowy, *AP Exclusive: Ferguson No-Fly Zone Aimed at Media*, AP News (Nov. 2, 2014), https://apnews.com/united-states-government-674886091e344ffa95e92eb482e02be1...........................15

Joshua Barajas, *Shooting Deaths Climb in Trump's Mass Deportation Effort*, PBS News (Jan. 29, 2026), https://www.pbs.org/newshour/nation/a-look-at-shootings-by-federal-immigration-officers ....................................17

Julie Bosman, *How ICE Crackdowns Set Off a Resistance in American Cities,* N.Y. Times (Jan. 14, 2026),

https://www.nytimes.com/2026/01/14/us/ice-protests-activism.html 14, 19

Katherine Pomerantz, *The Story Behind TIME's Cover on Inequality in South Africa*, TIME (May 2, 2019) https://time.com/5581483/time-cover-south-africa/ .................................................................. 11

Larry Buchanan et al., *Bird's Eye View of Protests Across the U.S. and the World*, N.Y. Times (June 7, 2020), https://www.nytimes.com/interactive/2020/06/07/us/george-floyd-protest-aerial-photos.html ................................................................ 10

Leslie Kaufman & Ravi Somaiya, *Drones Offer Journalists a Wider View*, N.Y. Times (Nov. 24, 2013), https://www.nytimes.com/2013/11/25/business/media/drones-offer-journalists-a-wider-view.html ............................................................ 9

Letter from News Media Coalition to FAA (Jan. 28, 2026), available at https://www.newsmediaalliance.org/wp-content/uploads/2026/01/2026.01.28-Media-Coalition-to-FAA-Chief-Counsel.pdf ....................................................................................... 13

Matthew Cunningham-Cook, *DHS Claims Videotaping ICE Raids Is 'Violence'*, The Am. Prospect (Sep. 9, 2025), https://prospect.org/2025/09/09/2025-09-09-dhs-claims-videotaping-ice-raids-is-violence..................................................................................... 16

Nate Raymond & Jan Wolfe, *Trump Vowed to 'Bring Free Speech Back.' Judges in 75 Cases Ruled that He Has Stifled It*, Reuters, https://www.reuters.com/legal/government/trump-vowed-bring-free-speech-back-judges-75-cases-ruled-that-he-has-stifled-it-2026-08-04/ .................................................................................................. 14

Oxpeckers, *When Towns Run Dry* (last accessed Apr. 13, 2026), https://www.millefoto.com/aerial#/oxpeckers/.................................... 11

*Remembering 4 Phoenix Journalists Killed in Mid-air Helicopter Crash 19 Years Ago*, abc15.com (July 27, 2026), https://www.abc15.com/news/local-news/remembering-4-phoenix-journalists-killed-in-helicopter-crash-19-years-ago .......................... 12

Rowan Philp, *How to Expose Lies from the Skies Using Satellites and Drones*, Glob. Investigative Journalism Network (Nov. 3, 2021), https://gijn.org/stories/how-to-expose-lies-from-the-skies-using-satellites-and-drones/ ..................... 11

Ryan Van Velzer, *Police Drones Capture 'Beautiful and Ugly Truths' of Louisville Protests*, Louisville Pub. Media (Sep. 17, 2020), https://www.lpm.org/news/2020-09-17/police-drones-capture-beautiful-and-ugly-truths-of-louisville-protests..................... 10

Star Tribune, *A Close Examination of the Shooting of Renee Good* (YouTube, Jan. 10, 2026), https://www.youtube.com/watch?v=UHXkt3mBI-A ..................... 18

Tara Suter, *57 Percent Disapprove of the Way ICE Enforcing Immigration Laws: Poll*, The Hill (Jan. 13, 2026), https://thehill.com/policy/national-security/5687621-quinnipiac-poll-ice-enforcement/..................... 19

TIME Staff, *Aerial Photography's Surprising Role in History*, TIME (May 31, 2018), https://time.com/collections/drones/5289117/aerial-photography-drones-history/ ..................... 10

Valerie Belair-Gagnon, Taylor Owen & Avery E. Holton, *Unmanned Aerial Vehicles and Journalistic Disruption*, Digital Journalism (Jan. 27, 2017), https://conservancy.umn.edu/server/api/core/bitstreams/2354bc8a-0c9a-49dd-a3f1-3c0879cd8d50/content..................... 10

**Regulations**

14 C.F.R. § 107.23 (2026) ..................... 28

14 C.F.R. § 107.31 (2026) ..................... 28

14 C.F.R. § 107.41 (2026) ..................... 25

14 C.F.R. § 107.51 (2026) ..................... 28

14 C.F.R. § 107.51(b) (2026)..................... 25

14 C.F.R. § 91.119(b) (2026) .... 25

47 C.F.R. § 87.265 (2025) .... 25

Aeronautical Information Manual ch. 3 § 2-1 .... 25

Exec. Order No. 14305, 90 Fed. Reg. 24719 (June 6, 2025) .... 26, 27

NOTAM FDC 0/0230 .... 3

NOTAM FDC 1/8374 .... 3

NOTAM FDC 3/0104 .... 3

NOTAM FDC 4/2599 .... 15

NOTAM FDC 5/2595 .... 2

NOTAM FDC 5/3402 .... 3

NOTAM FDC 5/3678 .... 18

NOTAM FDC 5/6378 .... 2, 3, 25

NOTAM FDC 6/2824 .... 2

NOTAM FDC 6/4375 .... 2, 3, 13, 26

NOTAM FDC 9/3817 .... 3

## GLOSSARY

| | |
|---|---|
| Add. | Addendum to Petitioner's Motion for Interim Relief |
| CBP | U.S. Customs and Border Protection |
| Decl. | Declaration |
| DHS | Department of Homeland Security |
| FAA | Federal Aviation Administration |
| FDC | Flight Data Center, part of the FAA |
| JA | Joint Appendix |
| NOTAM | Notice to Airmen |
| Pet. Mot. | Petitioner's Motion for Interim Relief |
| Pet. Br. | Petitioner's Brief |
| UAS | Unmanned Aircraft System |

## STATEMENT OF IDENTITY, INTEREST, AND AUTHORITY TO FILE

*Amici* are civil liberties and media organizations that defend and advocate for robust freedoms of speech and the press. They share an interest in ensuring that the press can effectively monitor the conduct—and misconduct—of public officials, and they regularly advocate against government policies that seek to evade press and public oversight.

In the modern newsgathering environment, drones play an important and irreplaceable role in conducting this kind of public oversight. *Amici* submit this brief to highlight that role, to describe the First Amendment's protections for drone newsgathering, and to shine light on a troubling pattern of retaliation and media suppression that the flight restriction appears to fall into.

All parties have consented to the filing of this brief, and *amici* file it pursuant to Fed. R. App. P. 29(a)(2) and D.C. Circuit Rule 29(b).

## BACKGROUND

Drones are a vital newsgathering tool. Before January 16, 2026, journalists could freely use drones in their work, although they were "strongly advised" to keep their distance from military bases, airports, and sensitive moving assets like aircraft carriers and nuclear transport convoys.[1] Then, the Federal Aviation Administration (FAA) issued a Notice to Airmen that completely changed the landscape. *See* NOTAM FDC 6/4375 ("NOTAM"); JA03.

While in operation,[2] the NOTAM prohibited drone operators from flying within 3,000 lateral feet and 1,000 vertical feet of any facilities or

---

[1] NOTAM FDC 5/6378 (Oct. 25, 2025); JA02 ("strongly advis[ing]" operators to avoid drone flight within 3,000 lateral feet and 1,000 vertical feet of Department of Defense and Department of Energy facilities and vessels); NOTAM FDC 5/2595 (Aug. 25, 2025) (prohibiting drone operation within set distances of static "national security sensitive locations").

[2] The NOTAM has been supplanted—for now. On April 15, 2026—just days after Petitioner filed a Motion for Interim Relief challenging the NOTAM—the FAA issued a revised policy that largely reverted to the status quo. NOTAM FDC 6/2824. The FAA nonetheless retains authority to enforce the NOTAM's criminal and civil penalties against journalists who flew their drones during the period January 16–April 15, 2026, Pet. Br. at 28–29 (citing *Decker v. Nw. Env't. Def. Ctr.*, 568 U.S. 597, 610 (2013)), and it may re-impose the NOTAM at any time, as it apparently issues and revokes NOTAMs without any public input. JA04–07

"mobile assets" owned by the Department of Homeland Security (DHS). JA03. The FAA had never before restricted drones from operating near DHS's land-based "mobile assets," which include any DHS vehicle.[3] By expanding to cover land-based DHS mobile assets, the NOTAM created pop-up no-drone zones around any car, SUV, or other vehicle operated by federal immigration enforcement agents, whether or not they were identifiable as DHS vehicles. The NOTAM also contained enforcement provisions authorizing DHS agents to shoot down offending drones,

---

(demonstrating that FAA issued the challenged NOTAM based on a single email chain over the course of two days).

[3] Prior NOTAMs applied only to Department of Energy or Department of Defense mobile assets, although some earlier NOTAMs listed DHS as an entity empowered to mitigate (i.e. shoot down) drones deemed to pose a "credible safety or security threat." NOTAM FDC 5/6378 (Oct. 25, 2025); JA02; NOTAM FDC 3/0104 (Jan. 27, 2024); JA01; NOTAM FDC 1/8374 (effective Oct. 29, 2021); NOTAM FDC 0/0230 (effective Oct. 29, 2020); NOTAM FDC 9/3817 (effective Oct. 29, 2019). When Travis Fiebelkorn says "references to DHS were removed" from the October 2025 Mobile Assets NOTAM due to a lapse in DHS funding, JA14, he is referring to the omission of DHS's authority to mitigate drones that pose a security risk—not to any language that treated DHS mobile assets as covered by the prior NOTAMs. They were not, and never have been. The same is true for NOTAM FDC 5/3402, which governs the airspace over waterways within 12 nautical miles of shore. NOTAM FDC 5/3402 (Nov. 6, 2025). That NOTAM prohibits drones from flying near any Navy, Customs & Border Protection, or Coast Guard ship within U.S. territorial waters. *Id.* It does *not* cover DHS land-based mobile assets. *Id.*

prosecutors to bring criminal charges for NOTAM violations, and the FAA to revoke drone operators' licenses.

Given the difficulty of identifying DHS "mobile assets," and the impossibility of predicting where they might be traveling, the NOTAM made it functionally impossible for journalists ever to use drones for newsgathering in a city where immigration enforcement agents were deployed, since they could never be sure whether they would inadvertently fly within 3,000 lateral feet of a roaming DHS vehicle.

## SUMMARY OF ARGUMENT

Recording public officials performing their duties in public, including by drone, is protected First Amendment activity. By preventing journalists from using drones to gather news, the NOTAM significantly abridged their First Amendment rights—and to hear the FAA tell it, did so for no real reason. The NOTAM itself provided no rationale, and even the FAA's months-after-the-fact declaration essentially admits that the NOTAM was not "effectively" tailored to the FAA's purported interest: keeping drone operators safe. Fiebelkorn Decl. ¶ 8; JA16.

If the FAA was truly motivated by a desire to protect drone operators, the NOTAM—which created aerial danger zones for drone operators to navigate at the risk of having their drones shot out of the sky—was comically ill-tailored to that end. On the other hand, if the FAA wanted to prevent drone journalists like Petitioner from collecting and distributing information about DHS's hotly contested immigration enforcement efforts, the NOTAM was a perfect fit.

The NOTAM functionally banned journalists from using drones to report on immigration enforcement activities at the very moment when those enforcement activities were generating intense waves of public protest and political backlash. In the weeks before the NOTAM was imposed, Trump administration officials repeatedly characterized the filming of immigration enforcement agents as threatening and criminal—even as these agents were engaged in a pattern of violent retaliation against journalists, observers, and protestors. Video recordings of misconduct—including homicide—by immigration officers played a pivotal role in several high-profile lawsuits.

This context strongly suggests that the NOTAM sought to prevent the recording of immigration enforcement activity, thereby triggering

strict scrutiny under both the Speech and Press Clauses. *See Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 585 (1983) (recognizing the unique constitutional role of the press in "serv[ing] as an important restraint on government"). This Court need not apply strict scrutiny, however, because the NOTAM failed even under the more relaxed scrutiny permitted under *United States v. O'Brien*, 391 U.S. 367, 377 (1968).

*O'Brien* requires any "incidental restriction on alleged First Amendment freedoms" to be "no greater than [] essential" to further interests unrelated to the suppression of expression. *Id.* The NOTAM failed *O'Brien* scrutiny because it was far, far broader than necessary to achieve the safety interests the FAA claimed to be pursuing. The pre-existing rules governing the use of drones already imposed steep penalties for drone operators who interfered with law enforcement and prohibited reckless operation. And like the "floating buffer zones" invalidated in *Schenck v. Pro-Choice Network of Western New York*, 519 U.S. 357, 378–79 (1997), the NOTAM suppressed more First Amendment-protected activity than necessary by forcing journalists to

guess where and when they could operate their drones without inadvertently violating the NOTAM.

One way or the other, the NOTAM violated the First Amendment.

## ARGUMENT

### I. The First Amendment Protects Drone Recording as an Invaluable Newsgathering Tool

This Circuit has recognized that the First Amendment protects the act of recording video. *Price v. Garland,* 45 F.4th 1059, 1067, 1070 (D.C. Cir. 2022). A "growing chorus" of nine other Circuits has held the same, particularly when the recording captures public officials performing their duties in public. *Massimino v. Benoit*, No. 25-1104, 2026 WL 2386308, at *1, *3 (2d Cir. Aug. 17, 2026) (collecting cases).

This protection flows from two established First Amendment principles. First, recording video is an essential precursor to the protected act of broadcasting video. *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 595–96 (7th Cir. 2012) (citing *Citizens United v. FEC*, 558 U.S. 310, 336 (2010)). The Supreme Court applies First Amendment scrutiny to laws targeting speech "[w]hether government regulation applies to creating, distributing, or consuming speech." *Brown v. Ent.*

*Merchs. Ass'n*, 564 U.S. 786, 792 n.1 (2011); *United States v. Stevens*, 559 U.S. 460, 472 (2010).

Second, recording images for dissemination to the public is an essential newsgathering function—an activity crucial to an informed public and a functioning democracy. *Alvarez*, 679 F.3d at 597–98; *see also Sherrill v. Knight*, 569 F.2d 124, 129–30 (D.C. Cir. 1977) (explaining that the Press Clause requires "restrictions on newsgathering [to] be no more arduous than necessary").

Because modern drones are overwhelmingly used to capture images and video, courts have applied settled First Amendment principles to regulations that implicate the use of drones for information-gathering purposes. In *Yoder v. Brown*, for example, the court explained that the "novel" use of drones does not put their "creation of information beyond the bounds of First Amendment protections." 146 F.4th 516, 523 (6th Cir. 2025); *see also 360 Virtual Drone Servs. LLC v. Ritter*, 102 F.4th 263, 270–78 (4th Cir. 2024) (applying First Amendment analysis and distinguishing act of *selling* drone-created maps from act of capturing drone images).

District courts in this Circuit have likewise applied basic First Amendment principles to new technologies that facilitate the collection of information. In *Sandvig v. Sessions*, for instance, the court held that "[web]scraping is merely a technological advance that makes information collection easier; it is not meaningfully different from using a tape recorder instead of taking written notes." 315 F. Supp. 3d 1, 16 (D.D.C. 2018). The same logic applies here.

Drone reporting provides perspectives that cannot be captured by ground-based imagery, including wide-area documentation, real-time coverage of dynamic, large-scale events, and safe and non-intrusive observation of law enforcement activity.[4] Drones are far more maneuverable than ground-level cameras, and they are both much

[4] *See, e.g.*, Leslie Kaufman & Ravi Somaiya, *Drones Offer Journalists a Wider View*, N.Y. Times (Nov. 24, 2013), https://www.nytimes.com/2013/11/25/business/media/drones-offer-journalists-a-wider-view.html [https://perma.cc/6N9E-L3FD]; Digital Innovators' Summit, *Drone Journalism: 5 Great Examples*, Medium (Aug. 22, 2016), https://medium.com/@DISummit/drone-journalism-5-great-examples-1b482dd6bd78 [https://perma.cc/6EDX-BYUP].

cheaper and much safer than using a chartered plane or helicopter to record newsworthy events from above.[5]

Given their unique capabilities, it is unsurprising that drones have rapidly taken on a vital role in journalism.[6] For example, drones have captured irreplaceable bird's-eye images of protest activity[7]—including police uses of force against protestors[8]—uncovered and

---

[5] *See* TIME Staff, *Aerial Photography's Surprising Role in History*, TIME (May 31, 2018), https://time.com/collections/drones/5289117/aerial-photography-drones-history/ [https://perma.cc/X9DM-GND5] (detailing expensive, risky, and time-consuming methods journalists used to get aerial images before drones).

[6] *See* Valerie Belair-Gagnon, Taylor Owen & Avery E. Holton, *Unmanned Aerial Vehicles and Journalistic Disruption*, Digital Journalism (Jan. 27, 2017), https://conservancy.umn.edu/server/api/core/bitstreams/2354bc8a-0c9a-49dd-a3f1-3c0879cd8d50/content [https://perma.cc/7D5E-4VLU].

[7] *See, e.g.*, Larry Buchanan et al., *Bird's Eye View of Protests Across the U.S. and the World*, N.Y. Times (June 7, 2020), https://www.nytimes.com/interactive/2020/06/07/us/george-floyd-protest-aerial-photos.html [https://perma.cc/7EYN-7ZH9].

[8] Forbes Breaking News, *Drone Footage: Anti-ICE Protestors Face Off Against Authorities in Los Angeles, California* (YouTube, Jun. 9, 2025), https://www.youtube.com/watch?v=BgAgJyWC89k; Ryan Van Velzer, *Police Drones Capture 'Beautiful and Ugly Truths' of Louisville Protests*, Louisville Pub. Media (Sep. 17, 2020), https://www.lpm.org/news/2020-09-17/police-drones-capture-beautiful-and-ugly-truths-of-louisville-protests [https://perma.cc/C8G9-UL3M] (describing drone footage that showed Kentucky police deploying pepper balls at protestors).

documented serious humanitarian[9] and environmental crises,[10] and allowed journalists to provide the public with up-to-the-minute information about natural disasters without putting themselves in harm's way.[11]

---

[9] Rowan Philp, *How to Expose Lies from the Skies Using Satellites and Drones*, Glob. Investigative Journalism Network (Nov. 3, 2021), https://gijn.org/stories/how-to-expose-lies-from-the-skies-using-satellites-and-drones/ [https://perma.cc/9QWX-AYKW] (describing use of drones to break story about China's secret network of Uyghur detention centers).

[10] *See, e.g.*, Evan Simon, *'A Different Set of Rules': Thermal Drone Footage Shows Musk's AI Power Plant Flouts Clean Air Rules*, Tennessee Lookout (Feb. 16, 2026), https://tennesseelookout.com/2026/02/16/a-different-set-of-rules-thermal-drone-footage-shows-musks-ai-power-plant-flouts-clean-air-rules/ [https://perma.cc/Z8ZJ-MMAU]; Oxpeckers, *When Towns Run Dry* (last accessed Apr. 13, 2026), https://www.millefoto.com/aerial#/oxpeckers/ [https://perma.cc/VJ5D-UEWK]; Katherine Pomerantz, *The Story Behind TIME's Cover on Inequality in South Africa*, TIME (May 2, 2019) https://time.com/5581483/time-cover-south-africa/ [https://perma.cc/V8M9-ET3G]; Justin Worland, *Drones are Helping Catch Poachers Operating Under Cover of Darkness*, TIME (May 30, 2018), https://time.com/collections/drones/5279322/drones-poaching-air-shepherd/ [https://perma.cc/96CM-GJDP].

[11] Delanie Smither, *How the New York Times Used Drones and Maps to Visualize Hurricane Harvey's Impact on Texas*, Storybench (Sep. 29, 2017), https://www.storybench.org/how-the-new-york-times-used-drones-and-maps-to-visualize-hurricane-harveys-impact-on-texas/ [https://perma.cc/UT32-MBT8]; Daniel Hentz, *8 Ways Journalists Visualized California's Out-of-Control Wildfires*, Glob. Investigative Journalism Network (Sep. 26, 2018), https://gijn.org/stories/california-

In short, drones have a unique ability to capture images as events unfold across a broad area, and drone recordings convey those events more accurately and comprehensively than otherwise possible. Drone reporting plays a crucial role in safely covering fast-paced, breaking news. And when drones are used to record government activities in public, they promote public oversight and democratic accountability. Government regulations that unduly restrict the use of drones for newsgathering thus undermine core First Amendment values.

## II. The NOTAM Violated the First Amendment by Unduly Abridging the Right to Record

The NOTAM imposed an impermissible restriction on the use of drones for newsgathering. It banned all drone flights—including all drone newsgathering—within 3,000 lateral feet and 1,000 vertical feet of, among other things, DHS "facilities and mobile assets, including

---

wildfires/ [https://perma.cc/K4AG-QRDL]. Before journalists routinely used drones, numerous reporters died in helicopter crashes. *Remembering 4 Phoenix Journalists Killed in Mid-air Helicopter Crash 19 Years Ago*, abc15.com (July 27, 2026), https://www.abc15.com/news/local-news/remembering-4-phoenix-journalists-killed-in-helicopter-crash-19-years-ago [https://perma.cc/9A9B-WEYQ]; *2 Killed as KOMO News Helicopter Crashes Near Space Needle*, KOMO News (March 18, 2014), https://komonews.com/news/local/2-killed-as-komo-news-helicopter-crashes-near-space-needle-11-20-2015 [https://perma.cc/YN9D-D4T8].

vessels and ground vehicle convoys." NOTAM FDC 6/4375; JA03. Faced with the NOTAM's uncertain boundaries and severe penalties, and with no reliable way to determine compliance, journalists like Petitioner had to choose: attempt a flight and cross their fingers that their newsgathering drone would not stray into one of the government's pop-up no-drone zones, or forego their First-Amendment-protected activity altogether.

This dilemma was not theoretical. Sophisticated media organizations were unable to determine how to comply with the NOTAM. *See* Letter from News Media Coalition to FAA (Jan. 28, 2026).[12] And even the FAA officials who administered the NOTAM acknowledged that it was "ambiguous" and effectively impossible to comply with its broad restrictions without grounding newsgathering drones entirely in cities experiencing immigration enforcement activity. Pet. Mot. at Add. 23.

---

[12] Available at https://www.newsmediaalliance.org/wp-content/uploads/2026/01/2026.01.28-Media-Coalition-to-FAA-Chief-Counsel.pdf [https://perma.cc/NFF5-MGJH].

These restrictions fail under any applicable level of constitutional scrutiny.

### A. There is good reason to believe that the NOTAM's purpose was to prevent drones from reporting on immigration enforcement, triggering strict scrutiny.

The Trump Administration is engaged in a pattern of behavior designed to suppress critical press coverage.[13] The NOTAM appears to have been part of that pattern, imposing no-drone zones around all roving DHS patrols just as those patrols were provoking intense national backlash.[14]

The FAA asserts that it issued the NOTAM because of conversations with "the leadership team" that are neither included in the Administrative Record nor described in the after-the-fact declaration of FAA employee Travis Fiebelkorn. *See* Fiebelkorn Decl.

---

[13] Nate Raymond & Jan Wolfe, *Trump Vowed to 'Bring Free Speech Back.' Judges in 75 Cases Ruled that He Has Stifled It*, Reuters, https://www.reuters.com/legal/government/trump-vowed-bring-free-speech-back-judges-75-cases-ruled-that-he-has-stifled-it-2026-08-04/ [https://perma.cc/NN9M-U865] (Aug. 4, 2026).

[14] *See* Julie Bosman, *How ICE Crackdowns Set Off a Resistance in American Cities,* N.Y. Times (Jan. 14, 2026), https://www.nytimes.com/2026/01/14/us/ice-protests-activism.html [https://perma.cc/TS7D-RSGR].

¶ 5; JA14–16. If those leaders ordered the NOTAM to restrict the media's ability to cover controversial on-the-ground activities, it would not have been the first time.

The FAA has used airspace restrictions to curb newsgathering before. In 2014, the Associated Press obtained audio recordings showing that the FAA had worked with local police to impose a temporary flight restriction prohibiting drones from flying within a 37 square-mile area over Ferguson, Missouri[15] "to keep the media out" during protests over police brutality.[16]

The FAA seems to have used that strategy repeatedly during the surge of immigration enforcement in 2025–26. Video recordings took center stage during immigration crackdown that began in Los Angeles during summer 2025,[17] and Trump administration officials made no secret of their desire to stop people from capturing such recordings. At a

---

[15] NOTAM FDC 4/2599 (Aug. 12, 2014).

[16] Jack Gillum & Joan Lowy, *AP Exclusive: Ferguson No-Fly Zone Aimed at Media*, AP News (Nov. 2, 2014), https://apnews.com/united-states-government-674886091e344ffa95e92eb482e02be1 [https://perma.cc/NN8B-JQ44].

[17] *L.A. Press Club v. City of Los Angeles*, 799 F. Supp. 3d 1007, 1018–19 (C.D. Cal. 2025) (describing videos).

press conference following a raid where at least 12 people were injured and agents deployed tear gas against journalists, legal observers, and protestors,[18] former DHS Secretary Kristi Noem characterized filming ICE agents as "violence" and told the public that it would not be tolerated.[19] The DHS Assistant Secretary for Public Affairs subsequently characterized posting videos of ICE agents online as "doxing" and threatened to bring felony prosecutions.[20]

Meanwhile, immigration agents on the ground engaged in a pattern of violent retaliation against those who sought to peacefully record and observe immigration enforcement—a pattern that a district court found well documented by an "avalanche of evidence" in a case

---

[18] CBS News, *California Farm Worker Injured in Immigration Raid Dies; More than 300 Arrested, Feds Say* (July 12, 2025), https://www.cbsnews.com/news/more-than-300-arrested-immigration-raids-southern-california-farms-feds/ [https://perma.cc/YW2L-8WLS]; *L.A. Press Club v. Noem*, 799 F. Supp. 3d 1036, 1053–55 (C.D. Cal. 2025).

[19] Forbes Breaking News, *Kristi Noem Claims Videotaping ICE Agents is 'Violence' Following Camarillo, California Farm Raids*, at 0:22 (YouTube, July 14, 2025), https://www.youtube.com/watch?v=uDFX4q6huH8.

[20] Matthew Cunningham-Cook, *DHS Claims Videotaping ICE Raids Is 'Violence'*, The Am. Prospect (Sep. 9, 2025), https://prospect.org/2025/09/09/2025-09-09-dhs-claims-videotaping-ice-raids-is-violence [https://perma.cc/5FU4-Y5C6].

that the Ninth Circuit recently affirmed. *L.A. Press Club v. Noem*, 799 F. Supp. 3d 1036, 1067 (C.D. Cal. 2025), *aff'd in relevant part, vacated in part and remanded*, 171 F.4th 1179, 1189 (9th Cir. 2026).

Subsequently, the Trump Administration initiated "Operation Midway Blitz" in Chicago on September 8, 2025.[21] Within eleven days, immigration agents had fatally shot a Chicago man[22] and protestors were massing outside the Broadview detention facility, where agents deployed tear gas, pepper balls, and rubber bullets into the crowd.[23] Protest activity increased over the next two weeks, and immigration agents retaliated violently against those who observed and filmed them.

---

[21] Dept. of Homeland Security, *ICE Launches Operation Midway Blitz in Honor of Katie Abraham to Target Criminal Illegal Aliens Terrorizing Americans in Sanctuary Illinois* (Sep. 8, 2025), https://www.dhs.gov/news/2025/09/08/ice-launches-operation-midway-blitz-honor-katie-abraham-target-criminal-illegal [https://perma.cc/CUF2-39EV].

[22] Joshua Barajas, *Shooting Deaths Climb in Trump's Mass Deportation Effort*, PBS News (Jan. 29, 2026), https://www.pbs.org/newshour/nation/a-look-at-shootings-by-federal-immigration-officers [https://perma.cc/3QDV-FUS3].

[23] Charles Thrush, Leigh Giangreco & Alex V. Hernandez, *Agents Tear Gas, Detain Demonstrators Outside Broadview ICE Facility During Protest*, Block Club Chicago (Sep. 20, 2025), https://blockclubchicago.org/2025/09/19/ice-tear-gasses-detains-protesters-outside-broadview-facility/ [https://perma.cc/9UT8-LZT6].

*Chicago Headline Club v. Noem*, 810 F. Supp. 3d 842, 979 (N.D. Ill. 2025), *vacated as moot* 168 F.4th 1033 (7th Cir. 2026).

In the midst of the public outcry, the FAA imposed a sweeping flight restriction—at the request of DHS—that prohibited drones from operating anywhere within a 15-nautical-mile radius of downtown Chicago. NOTAM FDC 5/3678 (Oct. 1, 2025).[24]

Next, "Operation Metro Surge" began in Minneapolis in December 2025 and quickly reached a fever pitch, with over 3,000 agents deployed.[25] On January 7, 2026 (eleven days before the challenged NOTAM was imposed), immigration agents shot and killed Renee Good, a 37-year-old U.S. citizen and mother of three.[26] Multiple bystanders

---

[24] *See also* David Struett, *FAA Sets Unprecedented Drone Restrictions Over Chicago as Feds Step Up Immigration Arrests*, Chicago Sun Times (Oct. 2, 2025), https://chicago.suntimes.com/news/2025/10/02/faa-drone-zone-homeland-security [https://perma.cc/TG4D-5TV9].

[25] Gigi Douban, *Trump Border Czar Tom Homan Announces Minnesota Immigration Surge is Ending*, NPR (Feb. 12, 2026), https://www.npr.org/2026/02/12/nx-s1-5712280/minnesota-ice-surge-ends [https://perma.cc/7RV4-3JYS].

[26] Star Tribune, *A Close Examination of the Shooting of Renee Good* (YouTube, Jan. 10, 2026), https://www.youtube.com/watch?v=UHXkt3mBI-A.

captured the shooting on video, and coverage of the incident fueled stronger waves of protest against Operation Metro Surge.[27]

On January 13th (three days before the NOTAM was imposed), the Hill reported that 57% of Americans disapproved of ICE's enforcement conduct,[28] and a Minnesota district court held a hearing about whether to grant a preliminary injunction to a group of Minnesotans who alleged they were retaliated against for observing public ICE enforcement activity.[29] Video recordings captured by civilian observers featured heavily in the preliminary injunction proceedings, with Plaintiffs submitting ten video exhibits.[30]

Two days later—and one day before the challenged NOTAM was imposed—Border Czar Tom Homan threatened to collect the identities

---

[27] Julie Bosman, *supra* note 14.

[28] Tara Suter, *57 Percent Disapprove of the Way ICE Enforcing Immigration Laws: Poll*, The Hill (Jan. 13, 2026), https://thehill.com/policy/national-security/5687621-quinnipiac-poll-ice-enforcement/ [https://perma.cc/9J3C-LT88].

[29] Motion Hearing, *Tincher v. Noem*, 816 F. Supp. 3d 931 (D. Minn. Jan. 13, 2026) (No. 25-cv-04669), Dkt. No. 70.

[30] *Id.*, Dkt. No. 76 (Jan. 14, 2026).

of those who film immigration agents, put them in a "database," and try to get them fired.[31]

Against this backdrop—and the utter lack of justification the FAA has provided for the NOTAM—it certainly appears that the FAA issued the NOTAM to restrict drone operators from capturing unfavorable images of immigration enforcement agents.

Such a purpose triggers strict scrutiny under both the Speech Clause and the Press Clause. Content-based restrictions on First-Amendment-protected activity must be evaluated under strict scrutiny, because attempts to remove a certain topic from the national conversation strike at the core of the First Amendment's protections and are "presumptively invalid." *R.A.V. v. City of St. Paul*, *Minn.*, 505 U.S. 377, 382, 387 (1992); *Minneapolis Star*, 460 U.S. at 585; *see also Askins v. United States Dep't of Homeland Sec.*, 899 F.3d 1035, 1045 (9th Cir. 2018) (applying strict scrutiny to policy requiring permission to photograph CBP checkpoints).

---

[31] Ingraham Angle, *Homan Pushes to Create 'Database' to Make Those Who Impede ICE 'Famous'*, Fox News (Jan. 15, 2026), https://www.foxnews.com/video/6387789141112.

Strict scrutiny is especially warranted where regulations "target" or "single out the press" or impose more than an "incidental" burden on newsgathering. *See Minneapolis Star*, 460 U.S. at 591; *Grosjean v. Am. Press Co.*, 297 U.S. 233, 250 (1936); *cf. Cohen v. Cowles Media Co.*, 501 U.S. 663, 669–70 (1991). Imposing distinct burdens on the press "suggests that the goal of the regulation is not unrelated to suppression of expression, and such a goal is presumptively unconstitutional." *Minneapolis Star,* 460 U.S. at 575; *see also id.* at 585 n.7.

Because the NOTAM appeared to target newsgathering and imposed a burden on journalists that was "far from incidental," *People for the Ethical Treatment of Animals, Inc. v. N.C. Farm Bureau Fed'n, Inc.*, 60 F.4th 815, 827 (4th Cir. 2023), there is strong reason to believe that strict scrutiny should apply.

### B. Even if the FAA had a purpose other than to restrict drone newsgathering, the NOTAM triggered and failed the *O'Brien* test.

This Court need not decide whether strict scrutiny applies, however, because the NOTAM fails even the more permissive tests available under *United States v. O'Brien* and applicable to content-neutral "time, place, and manner" restrictions.

The First Amendment's protections come into play when "'speech' and 'nonspeech' elements are combined in the same course of conduct," 391 U.S. at 376, or when a statute directed at non-expressive conduct "impose[s] a disproportionate burden upon those engaged in protected First Amendment activity," *Hutchins v. District of Columbia*, 188 F.3d 531, 548 (D.C. Cir. 1999) (en banc) (quoting *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 704 (1986)). In such situations, courts treat the *O'Brien* test as interchangeable with intermediate scrutiny. *Tinius v. Choi*, No. 21-cv-0907, 2022 WL 899238, at *9 (D.D.C. Mar. 28, 2022)*, aff'd* 77 F.4th 691, 699 (D.C. Cir. 2023).

Even assuming the FAA had a purpose unrelated to the suppression of newsgathering or the restriction of certain content, the NOTAM triggered First Amendment scrutiny. It plainly imposed a "disproportionate burden" on those engaged in First Amendment-protected activity by prohibiting journalists from using drones as a key newsgathering tool anywhere ICE was present. *See TikTok v. Garland*, 604 U.S. 56, 68–69 (2025) (applying intermediate scrutiny to business-ownership law that functionally banned social media app); *Tinius*, 2022

WL 899238, at *9 (same for curfew that functionally banned nighttime protest activity).[32]

Under *O'Brien*, the government must demonstrate that the relevant regulation (1) is within the constitutional power of the government to enact, (2) furthers an important or substantial government interest that is unrelated to the suppression of free expression, and (3) the incidental restriction of First Amendment freedoms is no greater than essential to further that interest. *O'Brien*, 391 U.S. at 376–77.

Under the interchangeable test applicable to time, place, and manner restrictions, a regulation must be content-neutral and narrowly tailored to serve "significant government interests," and it must leave open "ample alternative channels" for protected expression. *Tinius v.*

[32] In *Nat'l Press Photographers Ass'n v. McCraw*, the Fifth Circuit mistakenly overlooked the "disproportionate burden" line of cases, wrongly concluded that *O'Brien* applies only where a law restricts conduct that is "inherently expressive," and as a result, held that drone flight restrictions did not trigger any First Amendment scrutiny. 90 F.4th 770, 787–88 (5th Cir. 2024). This holding is flatly inconsistent with recent cases from both this Circuit and the Supreme Court that apply the "disproportionate burden" analysis. *Hutchins*, 188 F.3d at 548; *TikTok*, 604 U.S. at 68; *see also Tinius*, 77 F.4th 691.

*Choi*, 77 F.4th 691, 699 (D.C. Cir. 2023). Neither showing can be made here.

The government has made only the barest effort to articulate any interest underlying the NOTAM, let alone a "substantial" or "significant" one. *O'Brien*, 391 U.S. at 376-77; *Tinius*, 77 F.4th at 699. The NOTAM itself contains no information about why the flight restriction is necessary, and neither the Certified Administrative Record (CAR) nor the FAA's supplemental declaration provide the reasoning that is missing. The CAR consists of four pages: the NOTAM itself and a single email thread wherein FAA officials express a general interest in "strengthen[ing]" drone restrictions. JA03–06; JA06. The FAA's declaration is largely the same, spending a single paragraph on the rationale for the challenged NOTAM before conceding that the revised, April NOTAM "more effectively meets" the FAA's asserted goal: "ensuring the safety of the flying public by warning UAS operators to avoid flying in proximity to covered mobile assets." Fiebelkorn Decl. ¶¶ 6, 8; JA15–16.

Even if this tepid, after-the-fact justification could constitute a substantial interest, the NOTAM was not at all tailored to meeting it.

Drone operators[33] were substantially *less* safe under the revised regime than they were under the old one. Before the NOTAM, only the Department of Defense could "mitigate" a drone—in other words, shoot it down—and only if it deemed that the drone "pose[d] a credible safety or security threat to protected personnel, fac[ilities], or assets." NOTAM FDC 5/6378; JA02. Drone operators faced no risk of criminal prosecution, civil penalties, or license revocation if they flew too close to a "covered asset" and they were not prohibited from doing so. *Id.* Under the NOTAM, the risk to "the flying public" ballooned: operators risked having their drones shot down by an unspecified list of government officials if they flew too close to a *longer* list of *less* detectable assets,

[33] We assume that Fiebelkorn is referring to drone operators when he references "the flying public," since he describes the NOTAM as warning operators about risks to their drones. Fiebelkorn Decl. ¶ 6; JA15. Even so, the term "the flying public" is unclear. Generally, the FAA uses "the flying public" to refer to airline passengers. *See, e.g.*, 47 C.F.R. § 87.265 (2025). The NOTAM has no apparent effect on the safety of airline passengers, since a separate regime of flight restrictions covers airports as "controlled airspace." 14 C.F.R. § 107.41 (2026); Aeronautical Information Manual ch. 3 § 2-1. Except during takeoff and landing (at airports), airplanes are generally prohibited from flying at the levels covered by the NOTAM, 14 C.F.R. § 91.119(b) (2026), and drones are prohibited from flying at the levels occupied by airplanes, 14 C.F.R. § 107.51(b) (2026).

whether their flights posed a security risk or not. NOTAM FDC 6/4375; JA03.

In other words, the NOTAM prohibited a substantial amount of protected newsgathering activity without any conceivable increase in drone-operator safety, its stated objective. It was as though the government chose to "protect" the speaking public by converting a defamation law into a strict-liability ban on talking about other people. The First Amendment burdens imposed by such a restriction were far "greater than [] essential," *O'Brien*, 391 U.S. at 377, and not at all "narrowly tailored" to serve the government's stated interest, *see Initiative & Referendum Inst. v. U.S. Postal Serv.*, 417 F.3d 1299, 1307–09 (D.C. Cir. 2005).

This should end the inquiry, since "protecting the flying public" is the only rationale the FAA has offered for the NOTAM. Even if the NOTAM were intended to protect "covered assets" from some unexplained threat of drones,[34] however, it would still burden too much

---

[34] Travis Fiebelkorn's declaration contains a passing reference to a June 2025 Executive Order titled "Restoring American Airspace Sovereignty." The order asserted—without evidence—that drone use by "criminals, terrorists, and hostile foreign actors" creates "new and serious threats to

protected activity to satisfy *O'Brien* or the content-neutral time-place-and-manner test. As this Court explained in *Price,* "it is unreasonable to issue a blanket prohibition against the recording of a public official performing public duties[,]" "so long as the recording does not interfere with the performance of the official's duties." 45 F.4th at 1071.[35]

The Supreme Court has made clear that the government must show that its use of "other laws already on the books" or other less restrictive means has proved ineffective before it can justify a new law

---

our homeland." Exec. Order No. 14305, 90 Fed. Reg. 24719 (June 6, 2025). It states that "[d]rug cartels use [drones] to smuggle fentanyl across our borders, deliver contraband into prisons, surveil law enforcement, and otherwise endanger the public." *Id.* Other than preventing drone operators like Petitioner from "surveil[ling] law enforcement"—a constitutionally protected activity—the NOTAM has no connection to the interests asserted in the Executive Order. It bears no relation to drug cartels, prisons, or any other nebulous dangers to "the public."

[35] After stressing that the regulations at issue—which specifically protected newsgathering—were not forbidden "blanket prohibition[s]" on filming, the *Price* court went on to uphold portions of a law that charged commercial filmmakers fees to film at National Parks. *See id.* Those portions of *Price* were abrogated when Congress amended the challenged fee scheme. Pub. L. No. 118-234 (Jan. 4, 2025); 54 U.S.C. § 100905. As Judge Henderson explained, *Price* had "limited reach" even before the abrogation, and the D.C. Circuit "will still apply heightened scrutiny to a wide variety of speech." *Id.* at 1076 (Henderson, J., concurring).

implicating speech. *McCullen v. Coakley*, 573 U.S. 464, 492–94 (2014); *see also Reynolds v. Middleton*, 779 F.3d 222, 231 (4th Cir. 2015). Defendants have not done so here. A full suite of existing FAA drone regulations already protect government facilities and the public from drone-related safety risks. For example, drone operators must maintain visual line of sight with their drones, comply with altitude limitations, and avoid reckless operation.[36] And the FAA can impose significant penalties—up to $20,000—on drone operators who "deliberately or recklessly interfere[]" with government activities.[37] The FAA identifies no way in which these pre-existing regulations were insufficient to preserve the safety of either government assets or the public. *See generally* JA03–16.

What is more, the unpredictable no-drone zones created by the NOTAM prevented many drone flights that would never even have come close to a covered DHS asset, because operators could have no idea

[36] *See, e.g.,* 14 C.F.R. §§ 107.31 (2026) (visual line of sight), 107.23 (prohibiting careless or reckless operation and hazardous dropping of objects), 107.51 (setting max altitude of 400 feet above ground and max speed of 87 knots).

[37] FAA Extension, Safety, and Security Act of 2016, Pub. L. No. 114-190, 130 Stat. 615, 630 (2016).

where they were free to operate. As the Supreme Court held in *Schenck*, 519 U.S. at 378–79, "floating buffer zones" that leave would-be speakers uncertain about where they may speak can violate the First Amendment because they create "a substantial risk that much more speech will be burdened" than the buffer zones, by their terms, prohibit. *Id.*

The NOTAM functionally foreclosed drone newsgathering in areas where ICE enforcement was occurring, leaving drone journalists no comparable alternative means of obtaining the aerial images they sought to capture. *See supra* at 12–13. In doing so, it also failed to leave open "ample alternative channels" for First Amendment-protected activity. *See City of Ladue v. Gilleo*, 512 U.S. 43, 56 (1994); *Initiative & Referendum Inst.*, 417 F.3d at 1310.

* * * * *

The NOTAM did not meet even the most basic First Amendment requirements. It provided no clear or administrable criteria for compliance, instead relying on indeterminate triggers that required operators to guess whether they were within the scope of the restriction at any given moment. Its regime of uncertainty cast a substantial chill

over drone newsgathering across the entire United States. The First Amendment does not allow this kind of blunderbuss suppression of newsgathering activity.

## CONCLUSION

For the foregoing reasons and those given in Petitioner's briefs, the Court should grant the Petition and set aside the NOTAM.

Dated: September 4, 2026 Respectfully submitted,

/s/ David A. Schulz
David A. Schulz
*Counsel of Record*
Stacy Livingston
MEDIA FREEDOM AND INFORMATION ACCESS CLINIC
YALE LAW SCHOOL
127 Wall Street
New Haven, CT 06511
Tel: (212) 850-6103
David.Schulz@ylsclinics.org

Scarlet Kim
Brian Hauss
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
NY, NY 10004
212-549-2500

scarletk@aclu.org
bhauss@aclu.org

Arthur B. Spitzer
AMERICAN CIVIL
LIBERTIES UNION
FOUNDATION OF THE
DISTRICT OF COLUMBIA
529 14th Street, NW,
Suite 420
Washington, DC 20045
202-457-0800
aspitzer@acludc.org

Mickey H. Osterreicher
Alicia Wagner Calzada
NATIONAL PRESS
PHOTOGRAPHERS
ASSOCIATION
120 Hooper St.
Athens, GA 30602
716-983-7800
lawyer@nppa.org
advocacy@nppa.org

*Counsel for Amici*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rules of Appellate Procedure 29, 32(a), and 32(g), the undersigned counsel for amici certifies that this brief:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and Fed. R. App. P. 32(a)(5) because it contains 5,513 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and (6) because this brief has been prepared using Microsoft Office Word and is set in Century Schoolbook 14-point font.

Date: September 4, 2026

/s/ David A. Schulz
David A. Schulz

*Counsel of Record for Amici Curiae*

## CERTIFICATE OF SERVICE

I certify that on September 4, 2026, I electronically filed the foregoing brief with the United States Court of Appeals for the District of Columbia Circuit, using the appellate CM/ECF system. All parties are registered CM/ECF users, and service upon them will be accomplished by the appellate CM/ECF system.

Date: September 4, 2026

/s/ David A. Schulz
David A. Schulz

*Counsel of Record for Amici Curiae*